688 F.2d 1033
 66 A.L.R.Fed. 585, 8 Media L. Rep. 2305
 Donald E. MUIR, H. Jeff Buttram, and O. Navarro Faircloth,
Plaintiffs-Appellants,
v.
ALABAMA EDUCATIONAL TELEVISION COMMISSION: Jacob Walker,
etc., et al., Defendants-Appellees.
Gertrude BARNSTONE and Harvey Malyn, Plaintiffs-Appellees,
v.
The UNIVERSITY OF HOUSTON, KUHT-TV, et al., Defendants-Appellants.
 Nos. 80-7546, 81-2011.
 United States Court of Appeals,
Fifth Circuit.*
 Oct. 15, 1982.
 
 Edward Still, Susan Williams Reeves, Birmingham, Ala., Neil Bradley, Atlanta, Ga., for plaintiffs-appellants in No. 80-7546.
 Leitman, Siegal & Payne, P.A., Eddie Leitman, Andrew P. Campbell, Birmingham, Ala., for defendants-appellees in No. 80-7546.
 Theodore D. Frank, Washington, D.C., for amicus Public Broadcasting Service.
 Lonny F. Zwiener, Asst. Atty. Gen., Austin, Tex., Pat Bailey, Houston, Tex., for defendants-appellants in No. 81-2011.
 Marjorie S. Reed, Gen. Counsel, Daniel M. Armstrong, Deputy Gen. Counsel, Linda L. Oliver, F.C.C., Washington, D.C., for amicus curiae F.C.C.
 Theodore D. Frank, Washington, D.C., for amicus curiae Pub. Broadcasting Service.
 David H. Berg & Associates, Philip Zelikow, David H. Berg, Houston, Tex., for plaintiffs-appellees in No. 81-2011.
 Before BROWN, CHARLES CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, GARZA**, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAM D. JOHNSON, THOMAS A. CLARK, WILLIAMS and GARWOOD, Circuit Judges.***
 JAMES C. HILL, Circuit Judge:
 
 I. Introduction
 
 1
 The two appeals before this Court on consolidated rehearing raise the important and novel question of whether individual viewers of public television stations, licensed by the Federal Communications Commission to state instrumentalities, have a First Amendment right to compel the licensees to broadcast a previously scheduled program which the licensees have decided to cancel. For the reasons stated below we find that the viewers do not have such a right.
 
 
 2
 Both cases before us concern the decisions of the licensees not to broadcast the program "Death of a Princess." In Muir v. Alabama Educational Television Commission, 656 F.2d 1012 (N.D. Ala. 1980), the District Court for the Northern District of Alabama denied the plaintiff viewers' motion for a preliminary injunction requiring the defendant licensee, Alabama Educational Television Commission (AETC), to broadcast the program. The district court found: (1) that the likelihood of success on the merits criterion for an injunction had not been shown; (2) that the First Amendment protects the right of broadcasters, private and public, to make programming decisions free of interference; and (3) that viewers have no First Amendment right of access to the Alabama educational television network sufficient to compel the showing of "Death of a Princess." The court granted summary judgment for AETC.
 
 
 3
 In Barnstone v. University of Houston, 514 F.Supp. 670 (S.D. Tex. 1980), the District Court for the Southern District of Texas reached a different conclusion and granted the injunction requested by the plaintiff viewers and ordered the defendant licensee, University of Houston, to broadcast the program. The court held that KUHT-TV, the television station operated by the university, was a public forum and as such it could not deny access to speakers-here, the producers of "Death of a Princess"-who wished to be heard in the public forum, unless its reasons for doing so could withstand the rigorous scrutiny to which "prior restraints" are traditionally subjected.
 
 
 4
 On appeal a panel of this court affirmed the District Court's decision in Muir.[1] The panel held that the plaintiffs had no constitutional right to compel the broadcast of "Death of a Princess," and that AETC's refusal to broadcast the program was a legitimate exercise of its statutory authority as a broadcast licensee and was protected by the First Amendment. In Barnstone another panel of this court found that the decision in Muir required that the panel reverse the judgment of the District Court for the Southern District of Texas and dissolve the injunctive relief which had been granted the plaintiffs.[2]
 
 
 5
 We directed that both cases be consolidated and reheard en banc. We now affirm the judgment of the District Court for the Northern District of Alabama in Muir and reverse the judgment of the District Court for the Southern District of Texas in Barnstone.
 
 II. Factual Background
 
 6
 The Muir case arose when AETC decided not to broadcast "Death of a Princess," which had been scheduled for broadcast on May 12, 1980 at 8:00 P.M. The program, one of thirteen in the series "World," is a dramatization of the investigation by the program's director, producer and co-author into the motivations and circumstances which were said to have led to the July 1977 execution for adultery of a Saudi Arabian princess and her commoner lover.[3]
 
 
 7
 AETC, organized under Ala. Code § 16-7-1, is responsible for "making the benefits of educational television available to and promoting its use by inhabitants of Alabama" and has "the duty of controlling and supervising the use of channels reserved by the Federal Communications Commission to Alabama for noncommercial, educational use." Ala. Code § 16-7-5. AETC operates a statewide network of nine noncommercial, educational television stations licensed by the Federal Communications Commission under the Communications Act of 1934 (47 U.S.C. §§ 151, et seq.). AETC is funded through state legislative appropriations from the Special Education Trust Fund, matching federal grants through the Corporation for Public Broadcasting (CPB), and private contributions.
 
 
 8
 AETC is a member of the Public Broadcasting Service (PBS), a non-profit corporation distributing public, non-commercial television programs to its members by satellite. AETC is also a member of the Station Program Cooperative (SPC), a program funding and acquisition mechanism operated by PBS. Membership in SPC entitles licensees to participate in the selection and funding of national public television programs distributed by PBS. Only those licensees who contribute to a program's cost have a right to broadcast it. Those who contribute are free to broadcast or not to broadcast the program.[4]
 
 
 9
 PBS's acquisition of the program series "World" was funded by 144 public television licensees, including AETC, through the SPC. During the week prior to the scheduled broadcast of "Death of a Princess" AETC received numerous communications from Alabama residents protesting the showing of the program. The protests expressed fear for the personal safety and well-being of Alabama citizens working in the Middle East if the program was shown. On May 10 AETC announced its decision not to broadcast the film as scheduled.
 
 
 10
 Appellants, Muir, Buttram and Faircloth, residents of Alabama who had planned to watch "Death of a Princess," brought this action on May 12, 1980 under the First and Fourteenth Amendments and 42 U.S.C. § 1983, seeking to compel AETC to broadcast the film, and preliminary and permanent injunctions against AETC's making "political" decisions on programming.
 
 
 11
 The Barnstone case arose in a factual context similar to that of Muir. The University of Houston is a co-educational institution of higher learning funded and operated by the State of Texas. See Tex. Educ. Code Ann. §§ 111.01 et seq. The university funds and operates KUHT-TV, a public television station licensed to the university by the F.C.C. As a member of the SPC, KUHT-TV contributed to the funding of the "World" program series. KUHT-TV scheduled "Death of a Princess" for broadcast on May 12, 1980 at 8:00 P.M.
 
 
 12
 On May 1, 1980 KUHT-TV announced that it had decided not to broadcast the program. This decision was made by Dr. Patrick J. Nicholson, University of Houston Vice-President for Public Information and University Relations. Dr. Nicholson had never previously made a programming decision such as this, though as the university official charged with the responsibility of operating KUHT-TV he had the power to do so. In a press release announcing the cancellation Dr. Nicholson gave the basis of his decision as "strong and understandable objections by the government of Saudi Arabia at a time when the mounting crisis in the Middle East, our long friendship with the Saudi government and U.S. national interests all point to the need to avoid exacerbating the situation." Dr. Nicholson also expressed a belief that the program was not balanced in a "responsible manner."[5]
 
 
 13
 Upon learning of Dr. Nicholson's decision, on May 8, 1980, plaintiff Barnstone brought suit to require KUHT-TV to air "Death of a Princess."[6] Ms. Barnstone argued that as a subscriber to and regular viewer of KUHT-TV her First and Fourteenth Amendment rights were violated by the decision to cancel the program.
 
 
 14
 III. The First Amendment Does Not Prohibit Governmental Expression
 
 
 15
 The central argument advanced by the plaintiffs on appeal is that their First Amendment rights were violated when the defendants, as state actors, denied the plaintiffs an opportunity to view "Death of a Princess" on the public television stations operated by the defendants. We are thus called upon to determine whether the First Amendment rights of viewers impose limits on the programming discretion of public television stations licensed to state instrumentalities.
 
 
 16
 The First Amendment operates to protect private expression from infringement by government. Such protection applies both to the right to speak and the right to hear and is operative in a variety of contexts.[7] The amendment prohibits government from controlling or penalizing expression which has been singled out by government because of the expression's viewpoint.[8] The First Amendment also prohibits government from taking certain actions which impermissibly constrict the flow of information or ideas.[9]
 
 
 17
 The plaintiffs emphasize that the protection of the First Amendment extends only to private expression and not to governmental expression. They assert that the amendment serves only to confer duties on government-not rights.[10] While this argument of the plaintiffs may be essentially correct it in no way resolves the issue before us. To find that the government is without First Amendment protection is not to find that the government is prohibited from speaking or that private individuals have the right to limit or control the expression of government. Even without First Amendment protection government may "participate in the marketplace of ideas," and "contribute its own views to those of other speakers." Community Service Broadcasting v. F.C.C., 593 F.2d 1102, 1110 n. 17 (D.C. Cir. 1978).[11] As Justice Stewart aptly noted in Columbia Broadcasting Systems, Inc. v. Democratic National Committee, 412 U.S. 94, 139, n. 7, 93 S.Ct. 2080, 2105, n. 7, 36 L.Ed.2d 772 (1973) (Stewart, J., concurring) (hereinafter CBS ), "(g)overnment is not restrained by the First Amendment from controlling its own expression ... '(t) he purpose of the First Amendment is to protect private expression and nothing in the guarantee precludes the government from controlling its own expression or that of its agents.' "[12]
 
 
 18
 Our essential task thus does not center on determining whether AETC and the University of Houston are vested with a First Amendment right to make the programming decisions which they made regarding "Death of a Princess." In the absence of a violation of a constitutional right inhering in the plaintiffs, AETC and the University of Houston are free to make whatever programming decisions they choose, consistent with statutory and regulatory requirements. The fundamental question before us is whether in making the programming decisions at issue here, the defendants violated the First Amendment rights of the plaintiffs.
 
 
 19
 IV. The Regulatory Framework Enacted by Congress
 
 
 20
 Our inquiry into the constitutional issue at hand is aided by a brief review of the broadcast legislation enacted by Congress.[13] Such a review reveals an attempt by Congress to establish a regulatory system that accommodates the First Amendment interests of the public and of the private broadcast licensees and, it appears, the interests of government broadcast licensees unless otherwise limited by proper legislation.[14]
 
 
 21
 Prior to 1927 the allocation of broadcast frequencies was left entirely to the private sector and the result was "chaos." Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 375, 89 S.Ct. 1794, 1798, 23 L.Ed.2d 371 (1968) (hereinafter Red Lion ). It quickly became apparent that governmental regulation of the electromagnetic spectrum was essential if the spectrum was to be optimally utilized. "Without government control, the medium would be of little use because of the cacaphony of competing voices, none of which could be clearly and predictably heard." Red Lion, 395 U.S. at 376, 89 S.Ct. at 1799. Congress was confronted with a fundamental choice between total governmental ownership and control of the broadcast media-the choice of most other countries-or some other alternative. The decision of Congress to establish a system of broadcast licensing rather than government monopolization reflects "a desire to maintain for licensees so far as consistent with necessary regulation a traditional journalistic role." CBS, 412 U.S. at 116, 93 S.Ct. at 2093 (Burger, C.J., writing for three members of the court). Congress was, however, cognizant of the fact that the Nation's airwaves are a public resource not subject to private ownership. Thus, in enacting a regulatory scheme for the broadcast media, Congress was sensitive to the need to protect the rights of the public. The Court in Red Lion aptly noted that because of the scarcity of radio frequencies Congress is permitted to legislate a licensing regime which limits the number of people allowed to broadcast, but that "the people as a whole retain their interest in free speech by radio and their collective right to have the medium function consistently with the ends and purposes of the First Amendment." Red Lion, 395 U.S. at 390, 89 S.Ct. at 1806. The Court went on to observe that the purpose of the First Amendment in the context of broadcasting is "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee." Id. at 390, 89 S.Ct. at 1806.
 
 
 22
 Congress thus enacted the Radio Act of 1927 which established the Federal Radio Commission to allocate frequencies among competing applicants in a manner responsive to the public "convenience, interest, or necessity."[15] The Radio Act of 1927 was not only protective of the First Amendment interests of the public but it also recognized and sought to protect the First Amendment interests of broadcast licensees. The Court in CBS, 412 U.S. at 105, 93 S.Ct. at 2087, observed that in enacting this legislation "Congress chose to leave broad journalistic discretion with the licensees." The Court noted further that "Congress specifically dealt with and firmly rejected the argument that the broadcast facilities should be open on a nonselective basis to all persons wishing to talk about public issues." Id.
 
 
 23
 The Communications Act of 1934, 47 U.S.C. §§ 151 et seq., the successor to the Radio Act of 1927, was similarly designed by Congress to promote a balance between the First Amendment interests of the public and of the broadcast licensees. In furtherance of the First Amendment rights of the public the Communications Act specifically mandates that the Federal Communications Commission consider the public interest in the course of granting licenses, 47 U.S.C. §§ 307(a), 309(a); renewing them, 47 U.S.C. § 307; and modifying them.[16] The FCC is also required to consider the public interest in promulgating rules and regulations governing the use of broadcast licenses. 47 U.S.C. § 303.
 
 
 24
 In affirming the First Amendment interests of broadcast licensees § 3(h) of the Communications Act specifically provides that broadcast licensees are not to be deemed common carriers.[17] The Court in CBS observed that this along with other provisions "evince a legislative desire to preserve values of private journalism under a regulatory scheme which would insure fulfillment of certain public obligations." CBS, 412 U.S. at 109, 93 S.Ct. at 2089.[18] The FCC has, consequently, fulfilled its statutory obligations by promulgating regulations which view licensees as having the sole right and nondelegable responsibility to select the programs to be broadcast.[19] The Court in Cosmopolitan Broadcasting Corp. v. FCC, 581 F.2d 917, 921 (D.C. Cir. 1978), pointed out that:
 
 
 25
 A basic premise of Commission policy is that a licensee is a 'trustee' for the public and that he must therefore assume the 'primary duty and privilege to select the material to be broadcast to his audience ...' (cites omitted) 'The Commission has always regarded the maintenance of control over programming as a most fundamental obligation of the licensee.' (cites omitted)
 
 
 26
 Public television licensees are generally subjected to the same regulatory requirements as their commercial counterparts. See Accuracy in Media, Inc. v. FCC, 521 F.2d 288, 291 (D.C. Cir. 1975), cert. denied, 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976). Thus the FCC, in its demand for unfettered licensee control over programming has made no distinction between private and public licensees. City of New York Municipal Broadcasting System, 56 F.C.C.2d 169 (1975).
 
 
 27
 The Public Broadcasting Act of 1967[20] enacted by Congress to provide financial assistance for programming and the operations of public broadcasters further illustrates a Congressional desire that public broadcast licensees retain independent programming responsibility. In enacting this statute Congress expressed the belief that the "local stations are the bedrock" and they rather than anyone else, are to "retain the responsibility to assess community needs and determine what programs will best meet those needs." S. Rep. No. 222, 90th Cong., 1st Sess. 7 (1967), U.S. Code Cong. & Admin. News 1967, p. 1772, 1778. Congress noted that "the decision to broadcast ... (any) program remains with the local station," id. at 15, U.S. Code Cong. & Admin. News 1967, p. 1786, and "each station would be required to make its own decision as to what programs it accepts and broadcasts and at what time." Id. at 14-15,[21] U.S. Code Cong. & Admin. News 1967, p. 1786.
 
 
 28
 The picture which emerges from the regulatory scheme adopted by Congress is one which clearly shows broadcast licensees endowed with the privilege and responsibility of exercising free programming control of their broadcasts, yet also charged with the obligation of making programming decisions which protect the legitimate interests of the public. The right to the free exercise of programming discretion is, for private licensees, not only statutorily conferred but also constitutionally protected. CBS. Under the existing statutes public licensees such as AETC and the University of Houston possess the same rights and obligations to make free programming decisions as their private counterparts; however, as state instrumentalities, these public licensees are without the protection of the First Amendment. This lack of constitutional protection implies only that government could possibly impose restrictions on these licensees which it could not impose on private licensees. The lack of First Amendment protection does not result in the lessening of any of the statutory rights and duties held by the public licensees. It also does not result in individual viewers gaining any greater right to influence the programming discretion of the public licensees.
 
 V. KUHT-TV and AETC are not Public Forums
 
 29
 It is clear that Congress did not deem it necessary for viewers to be accorded a right of access to television broadcast stations in order for the public's First Amendment interests in this medium to be fully realized. Indeed it is clear that Congress concluded that the First Amendment rights of public television viewers are adequately protected under a system where the broadcast licensee has sole programming discretion but is under an obligation to serve the public interest. In spite of this Congressional scheme the District Court in Barnstone found that KUHT-TV was a public forum because it was operated by the government for public communication of views on issues of political and social significance. The court held that as a public forum the station could not deny access to speakers who wished to be heard in the forum, unless the requirements for prior restraint were satisfied. 514 F.Supp. at 689-91.
 
 
 30
 The plaintiffs now urge that we affirm the District Court's ruling that public television stations are public forums. The plaintiffs, unlike the District Court, however, do not argue for a public right of access to the stations. Instead the plaintiffs contend that as public forums the stations are prohibited by the First Amendment from making programming decisions motivated by hostility to the communicative impact of a program's message and stemming from a specific viewpoint of the broadcaster.
 
 
 31
 We find both the holding of the District Court and the argument of the plaintiffs to be incorrect. The Supreme Court has recently rejected the theory adopted by the District Court that because a government facility is "specifically used for the communication of information and ideas" it is ipso facto a public forum. United States Postal Service v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 101 S.Ct. 2676, 2685 n. 6, 69 L.Ed.2d 517 (1981).[22] A facility is a public forum only if it is designed to provide a general public right of access to its use, or if such public access has historically existed and is not incompatible with the facility's primary activity.[23] In Southeastern Promotions, Ltd. v. City of West Palm Beach, 457 F.2d 1016 (5th Cir. 1972), we adopted the following test for determining whether a public facility is a "public forum":
 
 
 32
 does the character of the place, the pattern of usual activity, the nature of its essential purpose and the population who take advantage of the general invitation extended make it an appropriate place for communication of views on issues of political and social significance.
 
 
 33
 457 F.2d at 1019.
 
 
 34
 In the cases in which a public facility has been deemed a public forum the speakers have been found to have a right of access because they were attempting to use the facility in a manner fully consistent with the "pattern of usual activity" and "the general invitation extended."[24] The pattern of usual activity for public television stations is the statutorily mandated practice of the broadcast licensee exercising sole programming authority. The general invitation extended to the public is not to schedule programs, but to watch or decline to watch what is offered.[25] It is thus clear that the public television stations involved in the cases before us are not public forums. The plaintiffs have no right of access to compel the broadcast of any particular program.
 
 
 35
 Our holding today is consistent with the Supreme Court's ruling in CBS that television stations operated by private broadcast licensees provide no public right of access. The Court in CBS pointed out that the creation of a public right of access to television stations would result in the derogation of the licensees' duty to insure that their stations serve the public interest:
 
 
 36
 The result would be a further erosion of the journalistic discretion of broadcasters in the coverage of public issues, and a transfer of control over the treatment of public issues from the licensees who are accountable for broadcast performance to private individuals who are not. The public interest would no longer be "paramount" but, rather, subordinate to private whim.
 
 
 37
 CBS, 412 U.S. at 124, 93 S.Ct. at 2097. The court further observed that, aside from being inconsistent with the licensees' obligation to insure that the public interest is served, a public right of access is also inconsistent with the licensees' essential task of exercising editorial discretion:
 
 
 38
 Nor can we accept the Court of Appeals' view that every potential speaker is "the best judge" of what the listening public ought to hear or indeed the best judge of the merits of his or her views. All journalistic tradition and experience is to the contrary.
 
 
 39
 Id.
 
 
 40
 The plaintiffs stress that they do not argue for the creation of a public right of access to public television stations. They contend that, even without a public right of access, the stations are public forums and as such cannot make programming decisions based on the communicative impact of a program. We find this contention to be untenable. It is the right of public access which is the essential characteristic of a public forum and the basis which allows a speaker to challenge the state's regulation of the forum. The gravamen of a speaker's public forum complaint is the invalid and discriminatory denial of his right of access to the forum. If a speaker does not have a right of access to a facility, that facility by definition is not a "public forum" and the speaker is without grounds for challenge under the public forum doctrine.[26]
 
 
 41
 VI. The Decision to Cancel Death of a Princess was not
 
 Governmental Censorship
 
 42
 The plaintiffs argue that even if we decline to characterize KUHT-TV and AETC as public forums we should nonetheless find that the defendants violated the plaintiffs' First Amendment rights by "censoring" "Death of a Princess." The plaintiffs contend that censorship, in violation of the First Amendment, occurs when state officials in charge of state operated public television stations decide to cancel a scheduled program because of the officials' opposition to the program's political content.
 
 
 43
 There is no question that "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content .... The essence of this forbidden censorship is content control." Police Dept. of Chicago v. Mosley, 408 U.S. 92, 95-96, 92 S.Ct. 2286, 2289-2290, 33 L.Ed.2d 212 (1972). However, the First Amendment prohibitions applicable to one method of expression do not always transfer intact to another method because "(e)ach method tends to present its own peculiar problems." Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 503, 72 S.Ct. 777, 781, 96 L.Ed. 1098 (1952). The Supreme Court has thus recognized that "because the broadcast media utilize a valuable and limited public resource" they "pose unique and special problems not present in the traditional free speech case." CBS, 412 U.S. at 101, 93 S.Ct. at 2085.
 
 
 44
 We are not convinced that editorial decisions of public television stations owned and operated by the state must, or should, be viewed in the same manner and subjected to the same restrictions as state regulatory activity affecting speech in other areas. Standard First Amendment doctrine condemns content control by governmental bodies where the government sponsors and financially supports certain facilities through the use of which others are allowed to communicate and to exercise their own right of expression.[27] Government is allowed to impose restrictions only as to "time, place, or manner" in the use of such public access facilities-public forums.[28] ] As we observed earlier, however, the First Amendment does not prohibit the government, itself, from speaking, nor require the government to speak.[29] Similarly, the First Amendment does not preclude the government from exercising editorial control over its own medium of expression. See Wooley v. Maynard, 430 U.S. 705, 716-17, 97 S.Ct. 1428, 1436-37, 51 L.Ed.2d 752 (1977); Advocates for the Arts v. Thompson, 532 F.2d 792 (1st Cir.), cert. denied, 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976); Avins v. Rutgers, State University of New Jersey, 385 F.2d 151 (3d Cir. 1967), cert. denied, 390 U.S. 920, 88 S.Ct. 855, 19 L.Ed.2d 982 (1968); Network Project v. Corporation for Public Broadcasting, 4 Med. L. Rptr. 2399, 2409 (D.D.C. 1979).
 
 
 45
 The plaintiffs concede that state officials operating public television stations can exercise some editorial discretion. They contend, however, that in exercising this discretion the officials must be "carefully neutral as to which speakers or viewpoints are to prevail in the marketplace of ideas." CBS, Inc. v. FCC, 629 F.2d 1, 30 (D.C. Cir. 1980), aff'd 453 U.S. 367, 101 S.Ct. 2813, 69 L.Ed.2d 706 (1981). The plaintiffs further contend that if the officials restrict a program due to their hostility to the political content of the program then the restriction is presumptively unconstitutional. The plaintiffs suggest that we adopt the evidentiary standard established by the Supreme Court in Mt. Healthy City School Dist. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Under this standard the initial burden would be on the plaintiffs to show that unconstitutional motivations were a "substantial" or "motivating" factor in the defendants' decisions to cancel "Death of a Princess." Once this burden is met by the plaintiffs the duty shifts to the defendants to show that the decisions would have been the same if the improper factor had not been considered.
 
 
 46
 The plaintiffs' analysis fails to recognize a number of essential differences between typical state regulation of private expressive activity and the exercise of editorial discretion by state officials responsible for the operation of public television stations. When state officials operate a public television station they must necessarily make discriminating choices. As the Supreme Court pointed out in CBS, 412 U.S. at 124, 93 S.Ct. at 2097, "(f)or better or worse, editing is what editors are for; and editing is selection and choice of material." In exercising their editorial discretion state officials will unavoidably make programming decisions which can be characterized as "politically motivated." All television broadcast licensees are required, under the public interest standard, to cover political events and to provide news and public affairs programs dealing with the political, social, economic and other issues which concern their community. See, Representative Patsy Mink (WHAR), 59 F.C.C.2d 987 (1976); Fairness Doctrine and Public Interest Standards, 39 Fed. Reg. 26371 (July 18, 1974); Report and Statement of Policy re Commission En Banc Programming Inquiry, 44 F.C.C. 2303 (1960). The licensees are thus required to make the inherently subjective determination that their programming decisions are responsive to the needs, problems and interests of the residents of the area they serve. Red Lion, 395 U.S. at 380, 89 S.Ct. at 1801. A general proscription against political programming decisions would clearly be contrary to the licensees' statutory obligations, and would render virtually every programming decision subject to judicial challenge.
 
 
 47
 The plaintiffs seek to draw a distinction between a decision not to show a program and a decision to cancel a previously scheduled program. They suggest that while it is a proper exercise of editorial discretion for a licensee initially to decide not to schedule a program, it is constitutionally improper for the licensee to decide to cancel a scheduled program because of its political content. In support of their view the plaintiffs cited decisions holding that school officials may be free initially to decide which books to place in their school libraries but that a decision to remove any particular book may be subject to constitutional challenge.[30] We are not persuaded, however, that the distinction urged upon us is valid or that the school library cases are applicable.
 
 
 48
 The decision to cancel a scheduled program is no less editorial in nature than an initial decision to schedule the program. See Advocates for Arts v. Thomson, 532 F.2d 792 (1st Cir.), cert. denied, 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976). Both decisions require the licensee to determine what will best serve the public interest, and, as we noted earlier, such a determination is inherently subjective and involves judgments which could be termed "political."
 
 
 49
 School libraries are distinguishable from broadcast stations in a number of important ways. There are limited hours in a day for broadcasting, and broadcast licensees are constantly required to make sensitive choices between available programs. Cf. Board of Education v. Pico, --- U.S. ----, ----, n. 1, 102 S.Ct. 2799, 2814, n. 1, 73 L.Ed.2d 435 (1982) ("The school's finite resources-as well as the limited number of hours in the day-require that educational officials make sensitive choices between subjects to be offered ....") (Blackmun, J., concurring in part). The maintenance of one volume on a library shelf does not (absent space limitations) preempt another. In broadcast, only one transmission of information, entertainment, or other message can occur at any one time. A library constantly and simultaneously proffers a myriad of written materials. As discussed in Part IV, hereinabove, the Congress has undertaken its careful analysis and balancing of conflicting interests involved in broadcasting and in public broadcasting, and the judicial branch should pay careful attention.[31] CBS, 412 U.S. at 103, 93 S.Ct. at 2086. There have been no comparable deliberations or enactments by that branch with respect to libraries. More specifically, there is no counterpart, vis-a-vis libraries, to the Federal Communications Commission's "Fairness Doctrine."[32] When a television broadcaster finds that it has scheduled a program espousing one view, it may have unwittingly encumbered its limited broadcast hours with a requirement that equal time be devoted to other viewpoints which might touch upon an issue of limited interest in its viewing area. But the maintenance of one volume espousing one side of an issue does not invoke government regulation requiring that shelf space be made available for all other views. Finally, a school would be expected to furnish only one library for its student population. The residents of a state may expect a choice of a number of television stations, often with the publicly owned facility attracting the smallest number of viewers.
 
 
 50
 The right to cancel a program is, furthermore, far more integral a part of the operation of a television station than the decision to remove a book from a school library. Libraries typically have at least the opportunity to review a book before acquiring it, therefore, there may be "few legitimate reasons why a book, once acquired, should be removed from a library not filled to capacity." Pico v. Board of Education, 638 F.2d 404, 436 (2d Cir. 1980) (Newman, J., concurring), aff'd, --- U.S. ----, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982). In comparison, television stations frequently do not have the chance to see a program until after the station's schedule has been printed, and there are numerous legitimate reasons why a station may decide to cancel a program it has initially scheduled. Indeed FCC regulations specifically require that licensees retain the power to reject any program which the licensee has already contracted for if the licensee determines that the program is "unsatisfactory or unsuitable or contrary to the public interest." 47 C.F.R. § 73.658.
 
 
 51
 We conclude that the defendants' editorial decisions to cancel "Death of a Princess" cannot be properly characterized as "censorship." Had the states of Alabama and Texas sought to prohibit the exhibition of the film by another party then indeed a question of censorship would have arisen. Such is not the case before us. The states have not sought to forbid or curtail the right of any person to show or view the film. In fact plaintiff Barnstone has already viewed the film at an exhibition at Rice University in Houston.[33] The state officials in charge of AETC and KUHT-TV have simply exercised their statutorily mandated discretion and decided not to show a particular program at a particular time. There is a clear distinction between a state's exercise of editorial discretion over its own expression, and a state's prohibition or suppression of the speech of another.[34]
 
 
 52
 VII. The Plaintiffs Can Seek Remedial Relief from the FCC
 
 
 53
 Our holding that the defendants did not violate the plaintiffs' First Amendment rights does not preclude the plaintiffs from challenging the propriety of the defendants' programming decisions with the FCC. Our decision is limited to the constitutional issue presented. We offer no opinion as to whether or not the actions of AETC and the University of Houston comport with their statutory and regulatory obligation.
 
 
 54
 Under the Communications Act the FCC may at any time, upon public complaint or sua sponte, review the programming selections of its licensees to ascertain whether they are complying with the requirements of the Act, in particular the requirement that the licensee act in the public interest. 47 U.S.C. § 308(b). The FCC routinely reviews complaints similar to those raised by the plaintiffs.[35] If the FCC determines that a licensee has engaged in improper programming it can impose a variety of remedial sanctions including: admonishment of the licensee for irresponsible programming judgments, Columbia Broadcasting System (WBBM-TV), imposition of a forfeiture for programming inconsistent with the public interest, Illinois Citizens Committee for Broadcasting v. F.C.C., 515 F.2d 397 (D.C. Cir. 1974); declaration that the licensee has failed to comply with FCC policies, Representative Patsy Mink, issuance of a "short term" renewal, CBS, Inc., 69 F.C.C.2d 1082 (1978); designation of license renewal application for full evidentiary hearing, WTWV, Inc., 52 F.C.C.2d 633 (1977); and denial of license renewal.[36]
 
 VIII. Conclusion
 
 55
 The decisions of AETC and the University of Houston to cancel "Death of a Princess" did not violate the First Amendment rights of the plaintiffs. The plaintiffs have no constitutional right to compel the broadcast of the program. Accordingly, we find that the District Court for the Northern District of Alabama properly awarded summary judgment to AETC. We also find that the District Court for the Southern District of Texas erred in issuing its order requiring KUHT-TV to broadcast the program.
 
 
 56
 The judgment of the District Court for the Northern District of Alabama is AFFIRMED.
 
 
 57
 The judgment of the District Court for the Southern District of Texas is REVERSED and REMANDED. On remand the District Court shall dissolve the injunctive relief and render judgment for appellants.
 
 
 58
 RUBIN, Circuit Judge, with whom POLITZ, RANDALL and WILLIAMS, Circuit Judges, join, specially concurring.
 
 
 59
 While I join in the result reached by the majority, I reach my conclusion on a different basis. Therefore, I join in the views expressed by Judge Garwood and add:
 
 
 60
 The sensitive and important issues in these cases cannot be resolved simply by attempting to decide whether a television station operated by a state agency is, or is not, a public forum. That term is but a label, developed to describe a location the use of which is open to the public. It does not express a definition but a conclusion.[1] The limitations imposed by the first amendment on the operation of a medium of communication cannot be determined by application of the rules governing freedom of expression in streets and other areas that by tradition or design serve as platforms for expression subject only to reasonable time, place, and manner restrictions and free from content control.
 
 
 61
 The issue directly presented can be stated simply: whether an individual viewer has a right to compel a television station operated by a state agency to broadcast a single program previously scheduled by an employee of the agency that a higher-ranking state official has decided, because of its content, to cancel. This pretermits the factual questions whether the program was canceled for what the dissent calls "legitimate reasons" and whether the official's objection to the content of the program and to its political implications was in either of these cases the sole reason for canceling "Death of a Princess" or merely the decisive one. Although these are not unimportant inquiries, they do not focus on the crucial issue: how does the first amendment control state action when the state is operating a television station?
 
 
 62
 Determination of the constitutional limitations that result because a television licensee is a state agency rather than a private agency must take into account not only the rights of viewers but a number of other considerations. The license is federally bestowed. The state agency licensee has both a statutory duty to comply with the rules and regulations governing the use of its license[2] and, like other licensees,[3] the statutory right to determine the way in which it shall fulfill that duty.[4] Those state employees who are charged with operation of the station, whether high or low in the managerial hierarchy, may have some right to free expression, which may be stronger if, for example, they function in an academic environment devoted to freedom of inquiry.[5] Those who want access to the medium in order not to view and listen but to disseminate a message must also be considered. Viewers also have an interest in the content of programs, not only because of their "right to see" but also because the state agency is financed at least in part by viewers as taxpayers.
 
 
 63
 These interests are all entitled to consideration and some or all of them may be accorded constitutional protection. Whether a viewer has a right, therefore, to see a single program that has been canceled by station management cannot be determined by focusing only on the interests of the viewer.[6] The interests of other persons and the function the state is discharging must also be considered, for the duties imposed on the state in connection with its various activities depend in part on the functions served by those activities.
 
 
 64
 Even the fact that the state is engaged in television broadcasting does not fully define the constitutional limitations on its actions, for such broadcasting might be designed to serve differing purposes. Licensing is not destiny. That the state is the licensee does not predetermine the station's function. The state may elect the station's mission, so long as this mission is consistent with the station's license and the Constitution. The prerogatives of managers, editors, and programmers, the rights of access of those who seek exposure, and the rights of viewers, as well as the prerogatives of the licensee itself as a state agency, are at least in large part determined by this mission.
 
 
 65
 All, or in other instances a part, of a station's programs might be devoted to providing a medium for the communication of competing views.[7] Some channels on cable television networks and some viewer or listener call-in programs on television and radio stations are of this kind. Some television stations are devoted entirely to educational purposes, designed solely for pedagogy. Others may be operated to furnish a varied menu of entertainment having greater cultural and educational value than the programs available on commercial stations. While the record is not clear, it appears that the two stations involved in these cases were of this sort. Neither station has been shown to have been a magazine of the air, a forum for all views, or a dispassionate communicator on issues of the day. Each appears to serve instead a diet that differs from commercial television primarily in appeal to a somewhat more sophisticated audience, the absence of commercials, and efforts to raise funds from viewers.
 
 
 66
 The function of a state agency operating an informational medium is significant in determining first amendment restrictions on its actions. State agencies publish alumni bulletins, newsletters devoted to better farming practices, and law reviews; they operate or subsidize art museums and theater companies and student newspapers. The federal government operates the Voice of America[8] and Radio Free Europe and Radio Liberty,[9] publishes "journals, magazines, periodicals, and similar publications" that are "necessary in the transaction of the public business,"[10] including newspapers for branches of the Armed Forces, and pays the salaries of many federal officials who, like the President's Press Secretary, communicate with the public through the media. The first amendment does not dictate that what will be said or performed or published or broadcast in these activities will be entirely content-neutral. In those activities that, like television broadcasting to the general public, depend in part on audience interest, appraisal of audience interest and suitability for publication or broadcast inevitably involves judgment of content.[11]
 
 
 67
 If the state is conducting an activity that functions as a marketplace of ideas, the Constitution requires content neutrality. Thus, a state university may not override editorial freedom for student newspapers.[12] If, however, the state's activity is devoted to a specific function rather than general news dissemination or free exposition of ideas, the state may regulate content in order to prevent hampering the primary function of the activity,[13] just as it may to some degree restrict the content of material distributed or displayed on military establishments,[14] in prisons,[15] on public buses,[16] or in public hospitals.[17]
 
 
 68
 All of the opinions in Board of Educ. v. Pico, --- U.S. ----, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982), recognize such a distinction either implicitly or expressly.[18] Justice Brennan's opinion for the plurality stresses "the limited nature of the substantive question" presented by the challenge to a school board's removal of books from a school library.[19] It does not classify the library as a public forum and emphasizes that the challenged action "does not involve the acquisition of books."[20] It postulates that "all First Amendment rights accorded to students must be construed 'in light of the special characteristics of the school environment,' "[21] just as, I submit, the rights of television viewers must be construed in the light of the special characteristics of the television medium and the mission of a particular state-operated television station. The plurality opinion turns on "the unique role of the school library"[22] as distinguished, in particular, from the determination of school curricula.[23] Because the plurality was addressing only the "suppression of ideas," it could write without considering "the discretion of a local school board to choose books to add to the libraries of their schools."[24]
 
 
 69
 In his concurring opinion, Justice Blackmun is willing to say only that "certain forms of state discrimination between ideas are improper."[25] He "doubt(s) that there is a theoretical distinction between removal of a book and failure to acquire a book."[26] Therefore, he is willing to say only that "school officials may not remove books for the purpose of restricting access to the political ideas or social perspectives discussed in them, when that action is motivated simply by the officials' disapproval of the ideas involved."[27] He also notes that the nature of the governmental activity at issue is significant in determining to what extent the first amendment limits government officials' discretion to regulate speech.[28]
 
 
 70
 The dissenters do not agree that students have a constitutional right to receive information or that "a school board (has a duty to) affirmatively aid (a) speaker in its communication with the recipient."[29] "(T)he 'right to receive information and ideas' ... does not carry with it the concomitant right to have those ideas affirmatively provided at a particular place by the government."[30] In his dissenting opinion, Justice Powell adds: "(T)his new found right (to receive ideas) finds no support in the First Amendment precedents of this Court."[31]
 
 
 71
 All of the opinions in Pico, therefore, seem to support the distinction between the application of the first amendment to limitations on the use of a public forum and the restrictions it may impose on governmental action in conducting a particular activity. Whether the views of the plurality or those of the dissenters express the constitutional interpretation that will ultimately be adopted, Pico seems to endorse the view that the nature of the activity determines the strictures the first amendment places on governmental action.
 
 
 72
 While the Mobile and Houston television stations are operated by state agencies, neither station is designed to function as a marketplace of ideas, a medium open to all who have a message, whatever its nature. The staff of each station had made an initial programming decision based in part on their assessment of the content of "Death of a Princess." Had the initial decision been not to use the program, the argument might have been made that this too was censorship and violated the potential viewers' right to see. If a decision is initially made at one level to use a program and is then reversed at a higher level, the content assessment involved is more apparent, but it is not necessarily converted thereby from legitimate programming into forbidden censorship.
 
 
 73
 Judicial reassessment of the propriety of a programming decision made in operating a television station involves not only interference with station management but also reevaluation of all of the content-quality-audience reaction factors that enter into a decision to use or not to use a program by a medium that cannot possibly, by its very nature, accommodate everything that every viewer might desire. With deference to the dicta observations made in the Pico plurality opinion, our reexamination of such a decision cannot logically be confined to occasions when higher officials overrule subordinates. If it is forbidden censorship for the higher official to cancel a program, it is equally censorship for the lower officials to decide initially to reject a program.
 
 
 74
 The Constitution is categoric but it does not command the theoretical. The state's discretion is confined by the functions it may perform as a broadcast licensee, and the purpose to which it has dedicated its license. Moreover, these cases involve only one program, not a licensee policy or practice of, for example, favoring only one political party, or of broadcasting racially or religiously discriminatory views.[32] Neither complaint even alleges that either station has a policy of curtailing access to ideas. Each seeks only to compel the defendant station to show a single program. Judicial intervention might be required if these or other licensees should adopt or follow policies or practices that transgress constitutional rights. But, one call, even if it is ill-advised, does not constitute a policy or practice, and judicial intervention does not appear required or warranted for a single programming decision.
 
 
 75
 For these reasons, although I cannot agree with all of the majority opinion, particularly its discussion of the application of the public forum doctrine, I concur in the result.
 
 KRAVITCH, Circuit Judge, dissenting:
 
 76
 I agree with the analysis in Judge Johnson's thorough and well-reasoned dissent, with one exception: his statement that the government's decision to withdraw a program becomes presumptively unconstitutional once a plaintiff has shown that the decision was made because of the program's "substantive content." In my view, in addition to "substantive content," there must be shown an improper motivation, an intent to "restrict( ) access to the political ideas or social perspectives discussed ...." Board of Education v. Pico, --- U.S. ----, ----, 102 S.Ct. 2799, 2814, 73 L.Ed.2d 435 (1982) (Blackmun, J., concurring). In this regard I agree with Judge Reavley. I do not join Judge Reavley's dissent, however, because his standard suggests that intent to suppress must be the sole factor before the withdrawal violates the First Amendment. The Pico plurality explicitly stated that an improper motive is a "decisive factor" and makes the withdrawal unconstitutional if it is a "substantial factor." Id. at ---- & n. 22, 102 S.Ct. at 2809, 2810 & n. 22 (plurality opinion of Brennan, J., Marshall, J., and Stevens, J.). The improper motivation need not be the only factor in the withdrawal decision. For these reasons I write separately.
 
 
 77
 FRANK M. JOHNSON, Jr., Circuit Judge, with whom HATCHETT, ANDERSON, TATE and THOMAS A. CLARK, Circuit Judges, join, dissenting.
 
 
 78
 I dissent because I am convinced that the majority has committed a serious error in applying the law to these cases. The clearly defined issue in these appeals is whether the executive officers of a state operated public television station may cancel a previously scheduled program because it presents a point of view disagreeable to the religious and political regime of a foreign country. The majority opinion permitting cancellation on these grounds flies completely in the face of the First Amendment and our tradition of vigilance against governmental censorship of political and religious expression.
 
 
 79
 Death of a Princess is a dramatization of one man's investigation of the circumstances and motives which led to the July 1977 execution of a Saudi Arabian princess and her lover for adultery. The film presents narrative and recreated interviews which examine the religious, cultural, and political hierarchy of Saudi Arabian society. Death of a Princess is directly critical of many aspects of the Saudi regime, including the government's enforcement of religious and cultural proscriptions.
 
 
 80
 The Saudi government reacted strongly to the production and distribution of Death of a Princess. After the film was shown in Great Britain, Saudi Arabia temporarily recalled its ambassador in protest. The Saudis again evidenced strong displeasure when PBS scheduled the film for broadcast in May 1980 as part of its World series.
 
 
 81
 The record in Muir reveals that during the period immediately preceding the May 12 air date the Alabama Educational Television Commission received numerous telephone calls expressing concern over the scheduled telecast of Death of a Princess.[1] William Harbert of Harbert Construction Company, an Alabama firm with substantial Saudi and Middle Eastern business, along with a representative of the Birmingham Area Chamber of Commerce, personally contacted Henry Bonner, program manager of the Alabama Educational Television Commission, to express their concern regarding the proposed broadcast. On May 9th Bonner reported these conversations and the fact of the telephone calls to Edward Wegener, general manager of the Alabama Educational Television Commission, who in turn contacted Jacob Walker, Chairman of the Alabama Educational Television Commission.
 
 
 82
 Walker scheduled a telephone conference with the other commissioners for later in the day. At some point, Walker spoke directly with Harbert, who supplied him with most or all of the facts relied on by the commission in reaching its conclusion that "broadcast of the program could expose Alabama citizens in the Middle East to physical and emotional abuse through rioting, physical assault and property damage." The plaintiffs unsuccessfully maintained that the decision "was one made out of political considerations." (R. at 96.)
 
 
 83
 The district court in Barnstone found that Dr. Patrick Nicholson, Vice President for Public Information and University Relations of the University of Houston, unilaterally decided to prevent broadcast of Death of a Princess on the University operated television station, KUHT-TV. Barnstone v. University of Houston, 514 F.Supp. 670 (S.D. Tex. 1980). Nicholson, who had never made a programming decision in his 17 years' tenure and who was opposed in his decision to cancel the scheduled program by the station's programming director and eventually by the general manager of KUHT-TV, cited as his reason the "strong and understandable objections by the government of Saudi Arabia." Id. at 674. While Dr. Nicholson testified that he feared the broadcast might "exacerbate the situation in the Middle East," the court found that he was "entirely unable ... to explain what he meant by this phrase ...." Id. at 691.
 
 
 84
 The majority of this Court-now in the twilight of its long and honorable existence[2]-has affirmed Muir and reversed Barnstone in an opinion which grants state authorities unlimited discretion to regulate the content of public television within their control. Because state law and FCC licensing grant defendants full broadcasting authority over these stations in their respective areas, the majority's decision confers unrestricted control over a monopoly market. See Ala. Code §§ 16-7-1-5; Barnstone v. University of Houston, supra, 514 F.Supp. at 672-73, 680. By finding no other restriction on state operated television than that imposed by federal regulation, the Court has elevated "the Communications Act above the Constitution." Barnstone, supra, 514 F.Supp. at 686. Moreover, the Court has abdicated its duty in an area in which the plaintiffs have no comparable remedy.
 
 
 85
 The freedom of expression protected by the First Amendment encompasses the rights of both speakers and listeners. CBS, Inc. v. FCC, 453 U.S. 367, 101 S.Ct. 2813, 2829, 69 L.Ed.2d 706 (1981); FCC v. Nat'l Citizens Committee for Broadcasting, 436 U.S. 775, 800, 98 S.Ct. 2096, 2114, 56 L.Ed.2d 697 (1978); First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 776-77, 98 S.Ct. 1407, 1415-1416, 55 L.Ed.2d 707 (1978); Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Coun., Inc., 425 U.S. 748, 756, 96 S.Ct. 1817, 1822, 48 L.Ed.2d 346 (1976); Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 102, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772 (1973); Kleindienst v. Mandel, 408 U.S. 753, 762-63, 92 S.Ct. 2576, 2581-82, 33 L.Ed.2d 683 (1972); Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 386-90, 89 S.Ct. 1794, 1804-1807, 23 L.Ed.2d 371 (1969); Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969); Lamont v. Postmaster General, 381 U.S. 301, 305-07, 85 S.Ct. 1493, 1495-1497, 14 L.Ed.2d 398 (1965). As the Supreme Court unanimously held in Red Lion, supra:
 
 
 86
 It is the right of the viewers and listeners, not the right of the broadcasters which is paramount. It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee. It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here. That right may not constitutionally be abridged ....
 
 
 87
 395 U.S. at 390, 89 S.Ct. at 1806 (citations omitted). The proper inquiry for this Court, then, should not be whether the Communications Act grants state broadcasters editorial discretion, but whether the action of state officials in these cases abridged free expression protected by the First Amendment. See Bellotti, supra.
 
 
 88
 Our system of constitutional protection clearly reflects that government may not restrict the free discussion of public issues on the basis of the political, religious, or ideological content of the message. Freedom of expression concerning public issues "is at the heart of the First Amendment's protection." First Nat'l Bank of Boston v. Bellotti, supra, 435 U.S. at 776, 98 S.Ct. at 1415; Mills v. Alabama, 384 U.S. 214, 218, 86 S.Ct. 1434, 1436, 16 L.Ed.2d 484 (1966); Garrison v. Louisiana, 379 U.S. 64, 74-75, 85 S.Ct. 209, 215-216, 13 L.Ed.2d 125 (1964) ("speech concerning public affairs is more than self-expression; it is the essence of self-government"). Self-government suffers when those in power suppress competing views on public issues. Bellotti, supra, 435 U.S. at 777 n. 12, 98 S.Ct. at 1416 n. 12. As a result, federal courts have consistently struck down content-based restrictions on the discussion of public issues. Carey v. Brown, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (statute which prohibited all peaceful picketing except for labor pickets impermissibly discriminated between lawful and unlawful activity on the basis of the content of the demonstrator's communication); First Nat'l Bank of Boston v. Bellotti, supra, (statute which prevented corporate expression on tax issue); Virginia State Board of Pharmacy v. Va. Citizens, supra, (invalidating prohibition on dissemination of over-the-counter drug prices); Police Dept. of the City of Chicago v. Mosley, 408 U.S. 92, 95-96, 92 S.Ct. 2286, 2289-90, 33 L.Ed.2d 212 (1972) (invalidating picketing ordinance which permitted labor picketing); Mills v. Alabama, 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966) (invalidating prohibition against discussion of political candidates on the last day of the campaign); Lamont v. Postmaster General, supra, (unjustifiable burden on the addressee's First Amendment rights to require that intended recipient of "communist" material affirmatively request that it be delivered); see Board of Educ. v. Pico, --- U.S. ----, ----, 102 S.Ct. 2799, 2810, 73 L.Ed.2d 435 (1982) (plurality) ("(L)ocal school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.' ") (quoting West Virginia v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943)).
 
 
 89
 This Court held in Bazaar v. Fortune, 476 F.2d 570, 574, aff'd as modified en banc, 489 F.2d 225 (5th Cir. 1973), cert. denied, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974), that once the state recognizes an activity which has elements of free expression it must operate the activity in accord with First Amendment principles. In Fortune this Court affirmed an order restraining University of Mississippi officials from interfering with the publication of a university sponsored literary magazine they considered controversial. The Court held in Brooks v. Auburn University, 412 F.2d 1171 (5th Cir. 1969), that the state university unconstitutionally abridged the First Amendment rights of disappointed listeners when Auburn's president withdrew a speaking invitation extended to the Reverend William Sloan Coffin, then Chaplain of Yale University, because of concern over what Reverend Coffin might speak about. The law is clear in this nation and up until now in this Circuit that once the government establishes a particular medium for the expression of different viewpoints it may not later intervene for the purpose of eliminating unpopular views. The law as I read and understand it has never condoned censorship in the name of editorial discretion. See, e.g., Board of Educ. v. Pico, supra, --- U.S. at ----, 102 S.Ct. at 2814 (Blackmun, J., concurring) ("(O)ur precedents command the conclusion that the State may not act to deny access to an idea simply because state officials disapprove of that idea for partisan or political reasons.") (footnote omitted).
 
 
 90
 The majority opinion completely ignores the critical issue in these cases by concluding that "(t)he state officials in charge of AETC and KUHT-TV have simply exercised their statutorily mandated discretion and decided not to show a particular program at a particular time." The very simple answer to that position is that FCC regulation is designed neither to preempt judicial scrutiny nor to redress state censorship as alleged in these cases.
 
 
 91
 Federal regulation of the broadcast media, for the most part, reflects the government's attempt to balance the allocation of a scarce resource with the First Amendment interests of private broadcasters and the public. See Red Lion Broadcasting Co. v. FCC, supra, 395 U.S. at 386-392, 89 S.Ct. at 1804-1808; CBS, Inc. v. Democratic Nat'l Comm., supra, 412 U.S. at 103-114, 93 S.Ct. at 2086-2092. The fact that state operated television stations are entitled to exercise editorial discretion, however, does not absolve them of their First Amendment responsibilities. "The First Amendment protects the press from governmental interference; it confers no analogous protection on the Government." CBS, Inc. v. Democratic Nat'l Comm., 412 U.S. at 139, 93 S.Ct. at 2104 (Stewart, J., concurring) (emphasis in original); Red Lion Broadcasting Co. v. FCC, 395 U.S. at 390, 89 S.Ct. at 1806 (First Amendment protects against governmental monopolization of the free marketplace of ideas). The majority commits fundamental error when it permits state broadcasters to ride on the coattails of their private counterparts. Even when the majority admits that state broadcasters "are without the protection of the First Amendment," it offers no principled reason why this "implies only that government could possibly impose restrictions on these licensees which it could not impose on private licensees."
 
 
 92
 In addition, while it is true that the FCC hears complaints similar to those raised in these cases, it is also true that the FCC routinely denies relief. A brief review of the cases cited by the majority reveals that the FCC steadfastly refuses to depart from its "longstanding policy of deferring to licensee discretion." Right to Life, Inc. v. WAVE-TV, 59 F.C.C.2d 1103 (1976). As the FCC itself has stated, the Commission "is prohibited by the First Amendment to the Constitution and Section 326 of the Communications Act of 1934 ... from censoring broadcast material, and it does not attempt to direct licensees in the selection or presentation of specific material." KMAP, Inc., 72 F.C.C.2d 241, 244 (1979):
 
 
 93
 (B)ecause of the sensitive First Amendment considerations involved, the Commission must strike a delicate balance between ensuring that licensees operate in the public interest and avoiding unnecessary interference in their programming decisions. Thus, the Commission has made clear that both the responsibility for and discretion in the selection of broadcast material rests with licensees.
 
 
 94
 Id.; RKO General, Inc., 46 F.C.C.2d 240, 244 (1974). In its pursuit of the public interest the FCC routinely defers to licensee "discretion as to the manner in which a controversial issue is to be covered, including such matters as appropriate spokesman and program format." William Harsha, 31 F.C.C.2d 847 (1971).[3]
 
 
 95
 In order for the FCC to take adverse action against a broadcaster for suppressing a particular viewpoint, the petitioner "must present substantial extrinsic evidence of intentional and specific incidents" of suppression. KMAP, Inc., supra, 72 F.C.C.2d at 244; Citizens Communications Center, 25 F.C.C.2d 705, 707 (1970) (evidence must firmly establish discriminatory policy inconsistent with the public interest); see Stone v. FCC, 466 F.2d 316, 322 (D.C. Cir. 1972) (court defers to expertise and experience of commission and will reverse grant of application only if commission's position is arbitrary, capricious, or unreasonable).[4] Complaints regarding individual cancellation decisions are regularly denied. E.g., Right to Life of Louisville, Inc., 59 F.C.C.2d 1103 (1976); RKO General, Inc., 46 F.C.C.2d 240 (1974); William Harsha, 31 F.C.C.2d 847 (1971); Citizens Communications Center, 25 F.C.C.2d 705 (1970).
 
 
 96
 Thus it is clear that the majority's deference to the FCC in these cases that present important constitutional questions amounts to nothing more than "... a promise to the ear ..." which will most certainly be broken "to the hope." See Cuthbert v. United States, 278 F.2d 220 (5th Cir. 1960). Relying on the system of FCC regulation, the majority has granted state broadcasters immunity from constitutional scrutiny. There is nothing, however, in the Communications Act or in the system of FCC regulation which prevents judicial scrutiny. On the contrary, the Supreme Court has recognized the need for vigilance in the face of governmental regulation. See, e.g., Red Lion, supra, 395 U.S. at 390, 89 S.Ct. at 1806; CBS, Inc. v. Democratic Nat'l Comm., 412 U.S. at 104-05, 93 S.Ct. at 2087-88. To rely on FCC regulation is to create a substantial gap in the protection of First Amendment interests. Because the FCC does not distinguish between private and public broadcasters in its regulation of the airwaves, see City of New York Mun. Broadcasting System, 56 F.C.C.2d 169 (1975), it provides no protection from the kind of state censorship alleged in these cases.
 
 
 97
 The concurring opinions of Judges Rubin and Garwood erroneously suggest that official censorship may only be found when the state operates a medium which is "content neutral," see, e.g., City of Madison Joint School Dist. v. Wisconsin Emp. Rel. Com'n, 429 U.S. 167, 175, 97 S.Ct. 421, 426, 50 L.Ed.2d 376 (1976), or which is a "public forum." E.g., Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). In all other cases, the concurrences suppose, the state must be given unbridled authority to discriminate among different viewpoints, even if the state chooses to suppress a particular point of view solely on the basis of the political, ideological, or religious content of the message. Otherwise, the opinions caution, any citizen would have the "right" to force the state operated televisions in this case to broadcast any program of his choosing.
 
 
 98
 These suppositions erroneously ignore the proper considerations a Court may give the editorial process, as demonstrated by this Court's previous experience. For example, the issue presented to this Court in Bazaar v. Fortune, supra, a case relied on to some extent by Judge Rubin, was not whether the University of Mississippi's literary magazine was "content neutral" or whether any student had the "right" to force the English Department and its student editors to publish any given article or short story. The issue in Fortune was whether the University chancellor could prevent the distribution of the magazine because one of its short stories contained "inappropriate" material criticizing contemporary race relations. 476 F.2d at 572-73. See Dickey v. Ala. State Bd. of Educ., 273 F.Supp. 613, 618-19 (M.D. Ala. 1967), vacated as moot sub nom. Troy State Univ. v. Dickey, 402 F.2d 515 (5th Cir. 1969) (district court order recognizing restrictions on the editorial operation of a school newspaper but finding ban on criticism of the Governor an unreasonable restriction). Similarly, in Brooks v. Auburn, supra, the issue before this Court was not whether the speakers' committee was forced to disregard all guidelines in selecting a speaker or whether any given student had the "right" to name the next speaker who was to be invited to the University. The issue in Brooks was whether the University president could effectively censor the political viewpoint of a previously chosen speaker by refusing to authorize payment of his expenses. 412 F.2d at 1172. In Brooks, as in Fortune, this Court concentrated on the particulars of the alleged censorship decision in the context of the existing editorial format. It was not necessary for the Court to find a "content neutral" or "open forum" setting in order to evaluate the claim of official censorship.
 
 
 99
 In the recent case of Board of Educ. v. Pico, --- U.S. ----, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982), both the plurality and Justice Blackmun recognized the presence of enforceable First Amendment rights, even within the context of a highly discretionary state function. As Justice Blackmun wrote, concurring: "In my view, we strike a proper balance here by holding that school officials may not remove books for the purpose of restricting access to the political ideas or social perspectives discussed in them, when that action is motivated simply by the officials' disapproval of the ideas involved." Id. at ----, 102 S.Ct. at 2814 (Blackmun, J., concurring). Unlike Judges Hill and Rubin, I find allegations of censorship in the context of state operated television broadcasting entitled to much greater scrutiny than similar allegations involving school board regulation of students' reading material. Public television stations "provide educational, cultural, and discussion programs which serve the general community." Senate report to the Public Broadcasting Act of 1967, 47 U.S.C.A. §§ 390-399, S. Rep. No. 222, 90th Cong., 1st Sess., reprinted in 1967 U.S. Code Cong. & Ad. News 1772, 1782. AETC is specifically charged with the duty "of making the benefits of educational television available to and promoting its use by inhabitants of Alabama ...." Ala. Code § 16-7-5. Viewed in the context of these stations' purposes and the framework of existing regulation, the editorial discretion of a state broadcaster is more circumscribed than that of a school board member. Moreover, the facts of both Muir and Barnstone reveal dramatic departures from established editorial practice in direct response to the urgings or implied threats of a foreign government.
 
 
 100
 Finally, the concurring opinions would appear to recognize official censorship by state television broadcasters when that censorship is conducted as a "policy or practice" of the state. Neither opinion, however, advances a principled distinction between censorship which is a "policy or practice" and that which is an individual overt act of suppression. It is clear to me that the First Amendment does not prohibit censorship only when it reaches the level of state "policy." To do so would be to allow the state to abrogate the fundamental concept of individual civil liberty. See, e.g., Pickering v. Board of Educ., 391 U.S. 563, 574-75, 88 S.Ct. 1731, 1737-38, 20 L.Ed.2d 811 (1968).
 
 
 101
 It is the judiciary which is the ultimate arbiter of the fundamental rights involved in these cases.[5] Courts may not abdicate their duty by reference to a system of administrative regulation, or because they would prefer that the plaintiffs take their complaints elsewhere. We must review the allegations of state censorship in the context of television broadcasting according to applicable legal standards. The standard for evaluating the allegations of abridgement in these cases must be that which was articulated in Mt. Healthy School Dist. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Once the plaintiff demonstrates that the government has silenced a message because of its substantive content, the government's decision becomes presumptively unconstitutional. The government should then be allowed to demonstrate that it would have taken the same action on the basis of legitimate reasons. Finally, the plaintiff should be given a full opportunity to refute the government's assertion.
 
 
 102
 Because of the importance of the values at stake, and the ability of the defendant usually to offer a colorably permissible reason for its actions, the trier of fact must critically examine the asserted rationale for the defendant's conduct. In Bazaar v. Fortune this Court rejected defendants' assertion that they were attempting to prevent the publication of a literary magazine because it contained obscenities when no action had been taken against similar writings found in the university library or on students' required reading lists. 476 F.2d at 578-79.[6] Similarly, in Brooks v. Auburn the Court rejected defendants' assertion that lawlessness would result from a speaker's engagement when defendants were unable to present suitable facts of potential reaction. 412 F.2d at 1173. In addition, the trier of fact must weigh the rationale for action with the extent of the action taken. An absolute ban on a particular program would require a stronger showing of justification than would a temporary withholding of the broadcast.
 
 
 103
 No one would doubt that "broadcast media pose unique and special problems not present in the traditional free speech case." CBS, Inc. v. Democratic Nat'l Comm., 412 U.S. at 101, 93 S.Ct. at 2086. The course of these cases amply demonstrates that proposition. The solution, however, is neither to deny the existence of constitutional rights nor to abdicate judicial responsibility. The solution is to face the problems squarely and resolve the issues accordingly.
 
 
 104
 The plaintiffs in Muir and Barnstone have made serious allegations of state censorship which the defendants have attempted to refute. Muir comes to us without benefit of a full hearing. The district court in Barnstone made substantial findings yet considered the evidence in light of an incorrect legal standard.[7] I would remand both cases for redetermination in light of the correct legal standard and burden of proof.
 
 REAVLEY, Circuit Judge, dissenting:
 
 105
 I cannot join the majority or concurring opinions for the reason that each of these television stations does far more than transmit expressions of the state. Our desire to free non-profit public broadcasting from judicial interference is no justification for pretending that the state is not relaying messages into the idea marketplace. I must conclude that the state encounters the First Amendment requirement of neutrality for reasons generally discussed in my original panel concurrence. Barnstone v. University of Houston, KUHT-TV, 660 F.2d 137, 138 (5th Cir. 1981).
 
 
 106
 On the other hand, I would not go so far as Judge Johnson does to make the state's decision presumptively unconstitutional whenever a program is not shown "because of its substantive content." State operated television stations should be given more latitude, even to choose on the basis of substantive content, in their program selection. They should be entitled to pursue excellence, to build viewing audiences, to respond to what viewers want, and to consider the effect of their programs upon that audience. Bona fide programming decisions would not, for me, violate First Amendment neutrality. Only if the decision to show or not to show were based upon viewpoint alone, in juxtaposition to the personal viewpoint of the programming authority or state superiors, entirely aside from any opinion as to program value or effect, would I regard neutrality abused and court action justifiable.*
 
 
 107
 GARWOOD, Circuit Judge, concurring.
 
 
 108
 I concur in the majority opinion, and append these remarks only to point up two additional interrelated matters I believe significant.
 
 
 109
 First, plaintiffs are not attacking governmental "public" broadcasting as such. Nor do they seek to require its operation to be on a pure "open forum" basis-like an empty stage available to all comers-where each citizen can cause the broadcast of his or her program of choice, with the inevitable selectivity determined by completely content neutral factors such as lot, or first come first served or the like.[1] Rather, plaintiffs seek to become a part of governmental "public" broadcasting essentially as it is, except they want it to broadcast this particular program of their choice. However, there is simply no way for them-together with all others who might wish to assert similar rights for their favorite "dramatization"-to become a part of such "conventional" (as distinguished from pure "open forum") governmental broadcasting except on the basis of governmental selection of the individual programs.
 
 
 110
 As the majority opinion convincingly demonstrates, in television broadcasting not only is selection inevitable, but it is likewise inevitable that in numerous instances it will be largely based on factors that are not content neutral and on considerations that involve sympathy for or hostility to the program's "message" on the part of the party having the power of selection.[2] This is not to say that program selection influenced by "message" sympathy or hostility on the part of governmental television stations is a desirable phenomenon, or even one which is wholly consistent with the values underlying the First Amendment. But such a characteristic is part and parcel of the operation of the conventional (not pure "open forum") governmental television stations of which plaintiffs seek to avail themselves. They are not entitled to have a special exception made in their favor so that for this particular program they are entitled to make the selection and require that these conventionally operated governmental stations broadcast it.
 
 
 111
 In contrast to a pure "open forum" system where diverse individual members of the public (and perhaps third-party producers) in effect select the programs and may be considered the speakers, in conventional broadcasting the power of selection rests with the station (or party controlling it) and in substance it is the speaker. Where a governmental unit controls a conventionally operated station, it is the speaker and speaks either in its corporate capacity or as a kind of proxy for the full body of its citizens. In an isolated instance, to grant an individual the right to require such a station to broadcast a particular program merely because the station rejected it for "political" type considerations, is, in effect, to force the governmental unit-in either its corporate or more general representative capacity-to speak in a certain way and to forego other speech it would have engaged in. To grant such a right on a consistent and thorough basis is to necessarily transform the station into one operated essentially on an "open forum" basis.
 
 
 112
 In the second place, plaintiffs do not assert that the stations in question have, on the basis of their agreement or disagreement with the different points of view involved or for similar "political" type reasons, structured their programming so that it constitutes a one-sided or slanted presentation of any matter of public concern, importance or controversy, whether relevant to the "message" of plaintiffs' desired program or otherwise.[3] So far as any such matters are concerned, plaintiffs' complaint is made essentially in a vacuum-they claim that merely because on one particular occasion a "political" type decision was made not to air one specific program plaintiffs wished to see, they therefore have a right to a court order directing these conventionally operated governmental stations to promptly air this precise program. We have rejected this claim. This is not to say, however, that no private citizen has a right to question the programming of governmental "public" television stations under any circumstances, or that the remedy of complaint to the F.C.C. will always be adequate.
 
 
 113
 A private citizen has no constitutional right to force a conventionally operated governmental "public" television station to enter with its broadcasting a particular propaganda war by showing a specific program selected by the citizen. Whether it is proper for such a governmental station to enter that kind of a war at all, or whether if it does so it may nevertheless present only one side while refusing, for reasons of a "political" nature, to broadcast any competing view, are questions of a different nature that are not now before us.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452-October 14, 1980
 
 
 **
 Judge Garza participated in the hearing but took senior status on July 7, 1982 and is no longer qualified to participate in the en banc decision
 Judges Jolly and Higginbotham joined the Court after submission and oral argument but do not choose to participate.
 
 
 ***
 John C. Godbold, Chief Judge, did not participate in the consideration or decision of this case
 
 
 [1]
 Muir v. Alabama Educational Television Commission, 656 F.2d 1012 (5th Cir. 1981)
 
 
 [2]
 Barnstone v. University of Houston, 660 F.2d 137 (5th Cir. 1981)
 
 
 [3]
 "Death of a Princess" was produced jointly by WGBH Educational Foundation, licensee of public television station WGBH-TV in Boston, Massachusetts, and ATV Network of London, England
 
 
 [4]
 PBS's "Station Users Agreement" reposing in licensees the absolute right to select programs they will broadcast and to determine when they will broadcast them accords with the FCC regulation contained in 47 C.F.R. § 73.658(e) which requires that every broadcaster reserve the right to reject any program offered to it. The FCC requires that every broadcaster consistently maintain independent control over selection of programs as a condition to retention of a license. Cosmopolitan Broadcasting, 59 F.C.C.2d 558 (1976). See p. 1040 infra
 
 
 [5]
 In addition to the reasons cited in the press release, the District Court, upon consideration of Dr. Nicholson's testimony, found four other reasons why the cancellation decision may have been made. First, Dr. Nicholson testified that he considered the program to be "in bad taste." Second, Dr. Nicholson expressed concern that some members of the public might believe that the "docu-drama" was a true documentary. Third, Dr. Nicholson testified that the University of Houston had previously entered into a contract with the Saudi Arabian royal family to instruct a particular princess. Finally, Dr. Nicholson testified that he had been in charge of fund raising activities for the university from 1957-1978 and that a significant percentage of the university's private contributions came from major oil companies and from individuals in oil related companies
 
 
 [6]
 Harvey Malyn was subsequently granted leave to join this action as a party-plaintiff
 
 
 [7]
 See L. Tribe, American Constitutional Law, 580-584 (1978)
 
 
 [8]
 See, Police Dept. of the City of Chicago v. Mosley, 408 U.S. 92, 95-96, 92 S.Ct. 2286, 2289-2290, 33 L.Ed.2d 212 (1972); New York Times Co. v. Sullivan, 376 U.S. 254, 269-270, 84 S.Ct. 710, 720-721, 11 L.Ed.2d 686 (1964)
 
 
 [9]
 See Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939)
 
 
 [10]
 Plaintiffs invoke Justice Stewart's holding in Columbia Broadcasting Systems, Inc. v. Democratic National Committee, 412 U.S. 94, 139, 93 S.Ct. 2080, 2104, 36 L.Ed.2d 772 (1973) (Stewart, J., concurring) that "(t)he First Amendment protects the press from governmental interference, it confers no analogous protection on the Government."
 
 
 [11]
 See L. Tribe American Constitutional Law, 588-590 (1978); P.A.M. News Corp. v. Butz, 514 F.2d 272 (D.C. Cir. 1975)
 
 
 [12]
 Government expression, being unprotected by the First Amendment, may be subject to legislative limitation which would be impermissible if sought to be applied to private expression. Yet there is nothing to suggest that, absent such limitation, government is restrained from speaking any more than are the citizens. Freedom of expression is the norm in our society, for government (if not restrained) and for the people. Freedom of speech is not good government because it is in the First Amendment; it is in the First Amendment because it is good government
 
 
 [13]
 The Supreme Court in CBS observed that First Amendment issues regarding broadcast licensees should be analyzed in light of the Congressionally established statutory and regulatory scheme:
 Balancing the various First Amendment interests involved in the broadcast media and determining what best serves the public's right to be informed is a task of great delicacy and difficulty. The process must necessarily be undertaken within the framework of the regulatory scheme that has evolved over the course of the past half century. For during that time Congress and its chosen regulatory agency have established a delicately balanced system of regulation intended to serve the interests of all concerned."
 412 U.S. at 102, 93 S.Ct. at 2086. The Court went on to point out:
 That is not to say we 'defer' to the judgment of the Congress and the Commission on a constitutional question, or that we would hesitate to invoke the Constitution should we determine that the Commission has not fulfilled its task with appropriate sensitivity to the interests in free expression. The point is, rather, that when we face a complex problem with many hard questions and few easy answers we do well to pay careful attention to how the other branches of Government have addressed the same problem.
 Id. at 103, 93 S.Ct. at 2086.
 
 
 [14]
 Extensive discussion of the history of broadcast regulation is found in CBS at 103-104, 93 S.Ct. at 2086-2087; Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 375-386, 89 S.Ct. 1794, 1798-1804, 23 L.Ed.2d 371 (1968); National Broadcasting Co. v. United States, 319 U.S. 190, 210-17, 63 S.Ct. 997, 1006-09, 87 L.Ed. 1344 (1943)
 
 
 [15]
 Radio Act of 1927 § 4, 44 Stat. 1163
 
 
 [16]
 The "public interest" includes the First Amendment interest of the public to receive "suitable access to social, political, esthetic, moral, and other ideas and experiences ..." Red Lion, 395 U.S. at 390, 89 S.Ct. at 1806
 
 
 [17]
 Section 3(h) provides as follows:
 'Common carrier,' or 'carrier' means any person engaged as a common carrier for hire in interstate or foreign communication by wire or radio or in interstate or foreign communication by wire or radio or in interstate or foreign radio transmission of energy, except where reference is made to common carriers not subject to this chapter; but a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier.
 47 U.S.C. § 153(h).
 
 
 [18]
 See also FCC v. Midwest Video Corp., 440 U.S. 689, 705, 99 S.Ct. 1435, 1443, 59 L.Ed.2d 692 (1979)
 "As we see it § 3(h), consistently with the policy of the Act to preserve editorial control of programming in the licensee, forecloses any discretion in the Commission to impose access requirements amounting to common-carrier obligations on broadcast systems. The provision's background manifests a congressional belief that the intrusion worked by such regulation on the journalistic integrity of broadcasters would overshadow any benefits associated with the resulting public access. It is difficult to deny, then, that forcing broadcasters to develop a "nondiscriminatory system for controlling access ... is precisely what Congress intended to avoid through § 3(h) of the Act."
 
 
 [19]
 The most salient example is section 73.658(e) of the Commission's rules which provides:
 No license shall be granted to a television broadcast station having any contract, agreement, or understanding, express or implied, with a network organization which, with respect to programs offered or already contracted for pursuant to an affiliation contract, prevents or hinders the station from (1) rejecting or refusing network programs which the station reasonably believes to be unsatisfactory or unsuitable or contrary to the public interest or (2) substituting a program which, in the station's opinion is of greater local or national importance.
 
 
 [47]
 C.F.R. § 73.658(e)
 
 
 [20]
 Public Broadcasting Act of Nov. 7, 1967, Pub. L. No. 90-129, 81 Stat. 365
 
 
 [21]
 This insistence on unhindered local licensee programming discretion was codified in Section 396(g)(1)(B) of the Act
 
 
 [22]
 The Court in United States Postal Service ruled that mailboxes are not public forums
 
 
 [23]
 Cf. Greer v. Spock, 424 U.S. 828, 836, 96 S.Ct. 1211, 1216, 47 L.Ed.2d 505 (1976): "The Court of Appeals was mistaken ... in thinking ... that whenever members of the public are permitted freely to visit a place owned or operated by the Government, then that place becomes a 'public forum' for purposes of the First Amendment. Such a principle of constitutional law has never existed, and does not exist now. The guarantees of the First Amendment have never meant 'that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.' " (quoting Adderley v. Florida, 385 U.S. 39, 48, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966)
 
 
 [24]
 The nature of facilities held to constitute public forums may be gleaned from the cases: municipal auditoriums, Southeastern Promotions Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); bus terminals, Wolin v. Port of New York Authority, 392 F.2d 83 (2d Cir. 1968), cert. denied, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968); airports, Chicago Area Military Project v. City of Chicago, 508 F.2d 921 (7th Cir. 1975), cert. denied, 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975); high school auditoriums, National Socialist White People's Party v. Ringers, 473 F.2d 1010 (4th Cir. 1973) (en banc); public libraries, Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (plurality opinion); shopping centers, Amalgamated Food Employees v. Logan Valley Plaza, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968); and welfare offices, Albany Welfare Rights Organization v. Wyman, 493 F.2d 1319 (2d Cir. 1974)
 
 
 [25]
 Similarly producers of television programs are extended no invitation to air their programs on the public television stations. Producers are, of course, free to submit their programs to the stations with a request that they be broadcast, but they have no right to compel such broadcast. The decision whether to broadcast a program remains entirely with the licensee. The District Court for the Southern District of Texas thus erred in finding that the producers of "Death of a Princess" had a right of access to station KUHT-TV to broadcast the film
 
 
 [26]
 See Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); Lehman v. Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974); Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966)
 
 
 [27]
 See Bazaar v. Fortune, 476 F.2d 570, 574, aff'd as modified en banc, 489 F.2d 225 (5th Cir. 1973), cert. denied, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974) (university literary magazine); Brooks v. Auburn University, 412 F.2d 1171 (5th Cir. 1969) (speaker invited by college student organization)
 
 
 [28]
 See L. Tribe 580-584
 
 
 [29]
 See p. 1050 infra; see also Houchins v. KQED, Inc., 438 U.S. 1, 13-14, 98 S.Ct. 2588, 2596, 57 L.Ed.2d 553 (1978)
 
 
 [30]
 At the time this case was submitted to us, the plaintiff cited, inter alia, Pico v. Board of Educ., 638 F.2d 404 (2d Cir. 1980), and we noted that the Supreme Court had granted certiorari. On June 15, 1982, the judgment of the Supreme Court was handed down, Board of Educ. v. Pico, --- U.S. ----, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982). We are unable to interpret the Court's opinion in Pico to give us guidance in the application of the First Amendment to the case at hand. First, Pico is a case involving a constitutional attack upon the removal of books from a school library which, as discussed in the text, is quite different from the situation confronting us. Further, we conclude that the Supreme Court decided neither the extent nor, indeed, the existence vel non., of First Amendment implications in a school book removal case
 A majority of the justices did not join any single opinion in Pico. There is a plurality opinion, i.e., one attracted more concurrences than did any other opinion leading to the result. The opinion by Justice Brennan is joined by Justice Marshall and Justice Stevens. Justice Blackmun concurred in all save one section, but dissents from the plurality's opinion that the "right to receive information" detected by Justice Blackmun imposes a duty upon the State to provide information or ideas, --- U.S. at ----, 102 S.Ct. at 2814, and is dubitante as to the plurality's opinion that there is a difference between the removal of a book from a school library and the failure to acquire a book. Id. n.1.
 The Chief Justice and three others, Justice Powell, Justice Rehnquist and Justice O'Connor, in dissent, agree with Justice Blackmun that there is no First Amendment obligation upon the State to provide continuing access to particular books, --- U.S. at ----, 102 S.Ct. at 2819 (Burger, C. J., dissenting), thus making a majority of Members for that view. The four in dissent find no difference, in constitutional law, in the removal of a book and in the failure to acquire it. Id. --- U.S. at ----, 102 S.Ct. at 2821. Three Members detect such a difference; four reject the notion; and one Member doubts its existence.
 The Fifth Member of the Court voting for the judgment expresses no opinion on the First Amendment issues, being of the opinion that the Court should not, until after remand, "issue a dissertation on the extent to which the First Amendment limits the discretion of the school board to remove books from the school library." Id. --- U.S. at ----, 102 S.Ct. at 2816 (White, J., concurring in the judgment). Justice White does not express the view that there may be facts implicating the First Amendment but, detecting that there may be a factual setting which would not involve constitutional concerns on the part of any Member, prefers a more complete record development before addressing such concerns.
 Being instructed by Marks v. United States, 430 U.S. 188, 192-93, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977), and Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion), that in no-clear-majority cases we should look to "that position taken by those members who concurred in the judgment on the narrowest grounds," id. at 169 n.15, 96 S.Ct. at 2923 n.15, and finding in the opinion of Justice White the narrowest grounds for the judgment, we conclude that Pico is of no precedential value as to the application of the First Amendment to these issues. (For commentary discussing the task of determining precedent from plurality opinions, see, e.g., Note, Plurality Decisions and Judicial Decisionmaking, 94 Harv. L. Rev. 1127 (1981); Note, The Precedential Value of Supreme Court Plurality Decisions, 80 Colum. L. Rev. 756 (1980).)
 While the majority of the Court entered judgment in Pico resulting in a remand for the development of the record, this was necessarily based upon the status of the record and the issues presented in the case. Here, we are satisfied that the record before us adequately presents the issues.
 
 
 [31]
 All branches of government are, and ought to be, guardians of the Constitution. It is no encroachment upon the private preserve of the Judicial Branch for the Congress to undertake implementation of the First Amendment; it is the duty of the Congress to do so. The Judiciary must be the final arbiter, but it is not the sole provider of freedom under the Bill of Rights
 The courts properly pay close attention to the implementation of constitutional guarantees by the Congress. CBS, 412 U.S. at 103, 93 S.Ct. at 2086. Indeed, the Supreme Court has not infrequently deplored the absence of action by the Congress, which, by its nature, is equipped to gather information and consider the impact and effectiveness of proposals to implement such guarantees far more broadly than the considerations advanced in a given case. See, e.g., Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 421, 91 S.Ct. 1999, 2017, 29 L.Ed.2d 619 (Burger, C. J., dissenting) (absence of Congressional action to implement Fourth Amendment deplored); Stone v. Powell, 428 U.S. 465, 500, 96 S.Ct. 3037, 3055, 49 L.Ed.2d 1067 (Burger, C. J., concurring) (desirability of Congressional implementation of Fourth Amendment again noted).
 
 
 [32]
 "Formulated under the Commission's power to issue regulations consistent with the 'public interest,' the (Fairness Doctrine) imposes two affirmative responsibilities on the broadcaster: coverage of issues of public importance must be adequate and must fairly reflect differing viewpoints. In fulfilling the Fairness Doctrine obligations, the broadcaster must provide free time for the presentation of opposing views if a paid sponsor is unavailable and must initiate programming on public issues if no one else seeks to do so."
 CBS, 412 U.S. at 110-11, 93 S.Ct. at 2090-91 (citations omitted).
 
 
 [33]
 Thus, contrary to the finding of the District Court in Barnstone, the defendant did not suppress the speech of the producer of "Death of a Princess." The defendants did not in any manner seek to prevent the producers from freely distributing or exhibiting the film. The defendants chose only not to exhibit the film through the stations which they were licensed to operate
 
 
 [34]
 The state may not suppress the expression of ideas. Thus, the state may not prevent Nazi's from expressing their views in a parade. National Socialist Party of America v. Village of Skokie, 432 U.S. 43, 97 S.Ct. 2205, 53 L.Ed.2d 96 (1977) (per curiam). There is a right to receive ideas that others express. Therefore, we apprehend that the state could not forbid or unreasonably obstruct, people within its jurisdiction from viewing the Nazi parade. Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965). Nevertheless, the State is free to decline to express itself in such a parade and we apprehend that, should a misguided police chief schedule the appearance of the police force at the head of a Nazi parade, wearing swastika arm bands, there would be no censorship, interference with the right to receive, or other First Amendment violation should the Mayor or City Council cancel the scheduled appearance of the police officers
 
 
 [35]
 See e.g., KMAP, Inc. 72 F.C.C.2d 241 (1979) (suppression of news concerning United Farm Workers Movement); Right to Life of Louisville, Inc., 59 F.C.C.2d 1103 (1976) (refusal to broadcast photographs of live fetuses in womb); RKO General, Inc., 46 F.C.C.2d 240 (1974) (failure to air program about Passover); Representative Patsy Mink (WHAR), 59 F.C.C.2d 987 (1976) (failure to broadcast strip mining program); William Harsha, 31 F.C.C.2d 847 (1971) (refusal to allow George Jessel's criticism of "The New York Times" and "The Washington Post"); Mrs. Alexandra Mark, 34 F.C.C.2d 434 (1974), aff'd Mark v. FCC, 468 F.2d 266 (1st Cir. 1972) (refusal to allow comments concerning astrology and astrological sign reading); Citizens Communications Center, 25 F.C.C.2d 705 (1970) (refusal to air intimate scene between Black and White actors); Letter to Richard L. Ottinger, 31 F.C.C.2d 852 (1970) (editing of remarks on Chicago conspiracy trial); Gross Telecasting, Inc. 14 F.C.C.2d 239 (1968) (news slanting for private interests of licensee); Tri-State Broadcasting Co., Inc. 59 F.C.C.2d 1240 (1976) (alleged news distortion to promote interests of advertisers); Public Communications, Inc., 49 F.C.C.2d 83 (1974) (deletion of reference to product in entertainer's monologue); Screen Gems Stations, Inc., 46 F.C.C.2d 252 (1974), recon. denied, 51 F.C.C.2d 557 (1975) (broadcast of Sugar Bowl would be contrary to public interest because the game discriminates against Blacks); Columbia Broadcasting System (Mobile Homes), 43 F.C.C.2d 1266 (1973) ("60 Minutes" segment on mobile homes failed to disclose CBS's interest in a Florida development); Mark Lane, 37 F.C.C.2d 630 (1972) (deletion of remarks in discussion of Viet Nam War); National Broadcasting Company (Chet Huntley), 14 F.C.C.2d 713 (1968) (Chet Huntley commentary re: Wholesome Meat Act of 1967 failed to disclose his ranching interests); KTYM (Anti-Defamation League), 4 F.C.C.2d 190 (1966), aff'd 403 F.2d 169 (D.C. Cir. 1968), cert. denied, 394 U.S. 930, 89 S.Ct. 1190, 22 L.Ed.2d 459 (1969) (broadcast of allegedly anti-Semitic remarks); Bernard Hanft, 14 F.C.C.2d 364 (1968) (failure to cover department store picketing); Columbia Broadcasting System (WBBM-TV), 18 F.C.C.2d 124 (1969) (allegation that "pot party" documentary was staged by broadcaster); Columbia Broadcasting System (Poor People's Campaign), 17 P & F Rad. Reg. 2d 843 (1969) (coverage of Poor People's Campaign allegedly slanted and staged); Radio Station WSNT, Inc. 27 F.C.C.2d 993 (1971) (failure to cover Black organization's activities); Time-Life Broadcast, Inc. (KOGO-TV), 33 F.C.C.2d 1050 (1972) (allegations of "Anglo bias" in the news); Hunger in America, 20 F.C.C.2d 143 (1969) (documentary allegedly misleading and staged); Lincoln County Broadcasters, Inc., 51 F.C.C.2d 65 (1975) (broadcast critical of zoning decision for political reasons)
 
 
 [36]
 Indeed in Alabama Educational Television Commission, 50 F.C.C.2d 461 (1975) the FCC denied AETC's license renewal application because of its finding that AETC's programming discriminated against Blacks
 
 
 [1]
 See Karst, Public Enterprise and the Public Forum: A Comment on Southeastern Promotions, Ltd. v. Conrad, 37 Ohio St.L.J. 247, 254 (1976)
 
 
 [2]
 47 U.S.C. § 303; see Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 379-80, 89 S.Ct. 1794, 1800-01, 23 L.Ed.2d 371, 382-83 (1969)
 
 
 [3]
 See Accuracy in Media, Inc. v. FCC, 521 F.2d 288, 291 (D.C.Cir.1975), cert. denied, 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976)
 
 
 [4]
 See Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 109-10, 93 S.Ct. 2080, 2089-90, 36 L.Ed.2d 772, 787-88 (1973); 47 U.S.C. § 326; Note, Broadcast Deregulation and the First Amendment: Restraints on Private Control of the Publicly Owned Forum, 55 N.Y.U.L.Rev. 517, 518, 521 (1980)
 
 
 [5]
 See Bazaar v. Fortune, 476 F.2d 570, 580 (5th Cir.) ("(W)e must take note of the historical role of the University in expressing opinions which may well not make favor with the majority of society and in serving in the vanguard in the fight for freedom of expression and opinion."), aff'd as modified en banc, 489 F.2d 225 (5th Cir. 1973) (per curiam), cert. denied, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974); Brooks v. Auburn Univ., 412 F.2d 1171, 1173 (5th Cir. 1969) (" 'A school may not stifle dissent because the subject matter is out of favor. Free expression is itself a vital part of the educational process.' ") (quoting Ferrell v. Dallas Indep. School Dist., 392 F.2d 697, 704 (5th Cir. 1968) (Godbold, J., concurring))
 
 
 [6]
 See generally Lehman v. City of Shaker Heights, 418 U.S. 298, 302-03, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770, 777 (1974) (plurality opinion):
 Although American constitutional jurisprudence, in the light of the First Amendment, has been jealous to preserve access to public places for purposes of free speech, the nature of the forum and the conflicting interests involved have remained important in determining the degree of protection afforded by the Amendment to the speech in question.
 
 
 [7]
 Cf. City of Madison Joint School Dist. v. Wisconsin Emp. Comm'n., 429 U.S. 167, 175, 97 S.Ct. 421, 426, 50 L.Ed.2d 376, 384 (1976) ("State has opened a forum for direct citizen involvement")
 
 
 [8]
 22 U.S.C. § 1463 (1976 & Supp. IV 1980)
 
 
 [9]
 Id. §§ 2871-2879
 
 
 [10]
 44 U.S.C. § 1108
 
 
 [11]
 A recent article on one of these activities, Voice of America, vividly illustrates this point. Bethell, Propaganda Warts, Harper's, May 1982, at 19. Indeed, this article describes an incident similar to the ones at issue in these cases. Id. at 21
 
 
 [12]
 See Bazaar v. Fortune, 476 F.2d at 573-75; Dickey v. Alabama State Bd. of Educ., 273 F.Supp. 613, 617-18 (M.D.Ala.1967), vacated as moot sub nom. Troy State Univ. v. Dickey, 402 F.2d 515 (5th Cir. 1968)
 
 
 [13]
 See Adderley v. Florida, 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149, 156 (1966) ("The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.")
 
 
 [14]
 Greer v. Spock, 424 U.S. 828, 836-40, 96 S.Ct. 1211, 1216-18, 47 L.Ed.2d 505, 513-15 (1976); id. at 843, 96 S.Ct. at 1220, 47 L.Ed.2d at 517-18 (Powell, J., concurring)
 
 
 [15]
 See Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 134-35, 97 S.Ct. 2532, 2542-43, 53 L.Ed.2d 629, 644-45 (1977)
 
 
 [16]
 Lehman v. City of Shaker Heights, 418 U.S. at 302-04, 94 S.Ct. at 2717-18, 41 L.Ed.2d at 776-78
 
 
 [17]
 Dallas Ass'n of Community Orgs. for Reform Now v. Dallas County Hosp. Dist., 670 F.2d 629, 631-32 & n.2 (5th Cir. 1982) (per curiam)
 
 
 [18]
 Seven Justices filed opinions in Pico. The Court divided four-four on the constitutional issue of the extent to which the first amendment limits the discretion of a school board to remove books from a school library. Justice White concurred in the judgment of the Court but did not reach this issue. See generally Maj. Op. supra, 688 F.2d at 1045, 1052, n.30
 
 
 [19]
 --- U.S. at ----, 102 S.Ct. at 2805, 73 L.Ed.2d at 443; see id. at ----, 102 S.Ct. at 2806, 73 L.Ed.2d at 444:
 In sum, the issue before us in this case is a narrow one, both substantively and procedurally. It may best be restated as two distinct questions. First, Does the First Amendment impose any limitations upon the discretion of petitioners to remove library books from the Island Trees High School and Junior High School? Second, If so, do the affidavits and other evidentiary materials before the District Court, construed most favorably to respondents, raise a genuine issue of fact whether petitioners might have exceeded those limitations?
 (Emphasis in original).
 
 
 [20]
 Id. at ----, 102 S.Ct. at 2805, 73 L.Ed.2d at 444 (emphasis in original)
 
 
 [21]
 Id. at ----, 102 S.Ct. at 2808-09, 73 L.Ed.2d at 447 (quoting Tinker v. Des Moines School Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731, 737 (1969)); see note 28 and accompanying text infra
 
 
 [22]
 Id. at ----, 102 S.Ct. at 2809, 73 L.Ed.2d at 448
 A school library ... is "a place dedicated to quiet, to knowledge, and to beauty." Brown v. Louisiana, 383 U.S. 131, 142, (86 S.Ct. 719, 724, 15 L.Ed.2d 637) (1966) (Opinion of Fortas, J.). Keyishian v. Board of Regents, 385 U.S. 589(, 603, 87 S.Ct. 675, 684, 17 L.Ed.2d 629) (1967), observed that "students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding." The school library is the principal locus of such freedom.
 Id. at ----, 102 S.Ct. at 2809, 73 L.Ed.2d at 448 (footnote omitted).
 
 
 [23]
 --- U.S. at ----, 102 S.Ct. at 2809, 73 L.Ed.2d at 448
 
 
 [24]
 Id. at ----, 102 S.Ct. at 2810, 73 L.Ed.2d at 450
 
 
 [25]
 Id. at ----, 102 S.Ct. at 2814, 73 L.Ed.2d at 454 (concurring in part and concurring in the judgment) (emphasis in original)
 
 
 [26]
 Id. at ---- n.1, 102 S.Ct. at 2814 n.1, 73 L.Ed.2d at 454 n.1
 
 
 [27]
 Id. at ----, 102 S.Ct. at 2814, 73 L.Ed.2d at 455 (emphasis in original)
 
 
 [28]
 See id. at ----, 102 S.Ct. at 2814, 73 L.Ed.2d at 454:
 (T)he unique environment of the school places substantial limits on the extent to which official decisions may be restrained by the First Amendment values. But that environment also makes it particularly important that some limits be imposed.
 (Emphasis in original).
 
 
 [29]
 Id. at ----, 102 S.Ct. at 2818, 73 L.Ed.2d at 460 (Burger, C. J., dissenting)
 
 
 [30]
 Id. at ----, 102 S.Ct. at 2819, 73 L.Ed.2d at 460 (quoting Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542, 549 (1969))
 
 
 [31]
 Id. at ----, 102 S.Ct. at 2822, 73 L.Ed.2d at 465; accord, id. at ----, 102 S.Ct. at 2830, 73 L.Ed.2d at 474 (Rehnquist, J., dissenting) ("The right described by (Justice Brennan's plurality opinion) has never been recognized in the decisions of this Court and is not supported by their rationale."); see id. at ----, 102 S.Ct. at 2835, 73 L.Ed.2d at 481 (O'Connor, J., dissenting)
 
 
 [32]
 See Board of Educ. v. Pico, --- U.S. at ----, 102 S.Ct. at 2810, 73 L.Ed.2d at 449 (plurality opinion); id. at ----, 102 S.Ct. at 2813, 73 L.Ed.2d at 453 (Blackmun, J., concurring in part and concurring in the judgment); id. at ----, 102 S.Ct. at 2827, 73 L.Ed.2d at 470 (Rehnquist, J., dissenting)
 
 
 [1]
 The district court in Muir entered its orders denying the preliminary injunction and granting defendants' motion for summary judgment in this case without benefit of oral evidence and on the basis of very limited discovery. Assuming that the court did not abuse its discretion in denying the preliminary injunction, the issue of summary judgment remains. In reviewing the appropriateness of summary judgment this Court must view the facts in the light most favorable to the nonmoving party to determine (i) whether there is a genuine issue as to any material fact, and (ii) whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Northeast Ga. Radiological Associates, P.C. v. Tidwell, 670 F.2d 507, 510 (5th Cir. 1982); Joplin v. Bias, 631 F.2d 1235, 1237 (5th Cir. 1980)
 
 
 [2]
 By Public Law 96-452, 94 Stat. 1994, effective October 1, 1981, the United States Congress divided the Fifth Circuit Court of Appeals into two new autonomous circuits-the new Fifth Circuit and the Eleventh Circuit. The cases now under consideration, as required by the Act, are being considered by the judges of the former Fifth Circuit as if the legislation dividing the circuit "had not been enacted." Pub. Law 96-452 § 9(3). Thus, having been established by Congress in 1891 as one of the original Circuit Courts of Appeals, the Fifth Circuit is indeed in its twilight
 
 
 [3]
 Although a controversy arose over the broadcast of Death of a Princess, it does not appear that the program itself dealt with a controversy within the meaning of the fairness doctrine. See RKO General, Inc., 46 F.C.C.2d 240, 243 (1974)
 
 
 [4]
 The substantial quantum of proof a petitioner must produce in order to persuade the FCC to deny a state broadcaster's license is clearly illustrated in Alabama Educational Television Commission, 50 F.C.C.2d 461 (1975). After finding overwhelming evidence of "serious misconduct involving discriminatory programming practices and an all but complete failure to serve the needs of Alabama's black residents" the Commission declined to renew AETC's license. 50 F.C.C.2d at 477. In rendering its decision, the FCC emphasized the practically uncontroverted evidence of AETC's racially discriminatory policies. "The systematic exclusion of blacks and of programming designed to serve their distinctive interests is thus demonstrated by the substantial evidence adduced by petitioners that blacks rarely appeared on AETC programs; that no black instructors were employed in connection with locally-produced in-school programs; and that unexplained decisions or inconsistently applied policies forced the pre-emption of almost all black-oriented network programming." Id. at 469. The Commission cautioned, however, that "(a)ny one of these decisions (to cancel black-oriented programs), taken by itself, might be reasonably regarded as a valid exercise of a licensee's discretion as to scheduling or program content." Id. In taking action the FCC acknowledged that it had refrained from imposing the same sanctions on AETC that it would have imposed on a private broadcaster on account of the considerable deference the Commission traditionally afforded state authority. See Puerto Rico Telephone Co., 47 F.C.C.2d 1166 (1974)
 
 
 [5]
 The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections
 West Virginia State Board of Education v. Barnette, 319 U.S. 624, 638, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943); see Wesberry v. Sanders, 376 U.S. 1, 17-18, 84 S.Ct. 526, 534-35, 11 L.Ed.2d 481 (1964).
 
 
 [6]
 As this Court concluded in Fortune:
 "... (W)e can only reiterate that speech cannot be stifled by the state merely because it would perhaps draw an adverse reaction from the majority of people, be they politicians or ordinary citizens, and newspapers. To come forth with such a rule would be to virtually read the First Amendment out of the Constitution and, thus, cost this nation one of its strongest tenets.
 476 F.2d at 579.
 
 
 [7]
 Judge McDonald found that KUHT-TV was a public forum and concluded that "decisions not to show programs on it may be challenged as prior restraint." 514 F.Supp. at 689. Evaluating the evidence accordingly, the court found that defendants' explanation for cancelling the program was "unacceptable as a matter of law." Id. at 691. As a result, it is not possible to determine how the district court would have evaluated the evidence in light of the Mt. Healthy standard
 
 
 *
 The recent opinion of a plurality of the Supreme Court in Board of Educ. v. Pico, --- U.S. ----, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982), supports the analysis offered here and in my separate opinion in Barnstone. The plurality reaffirmed that government action intended to suppress viewpoints with which the government disagrees offends the First Amendment, and also confirmed the distinction between "content" discrimination and "viewpoint" suppression which I offer here
 (Government officials) rightly possess significant discretion to determine the content of their school libraries. But that discretion may not be exercised in a narrowly partisan or political manner.... Our Constitution does not permit the official suppression of ideas. Thus whether petitioners' removal of books from their school library denied respondents their First Amendment rights depends upon the motivation behind petitioners' actions. If petitioners intended by their removal decision to deny respondent access to ideas with which petitioners disagreed, and if this intent was the decisive factor in petitioners' decision, then petitioners have exercised their discretion in violation of the Constitution.
 --- U.S. at ----, 102 S.Ct. at 2810 (footnote omitted) (citing Mt. Healthy City Board of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); compare Barnstone, 660 F.2d at 141 & n.11 (concurring opinion).
 Moreover, for the reasons I have already explained, see 660 F.2d at 141 n.9, I believe that the factual differences between this case and Pico make this an even stronger case for the application of the First Amendment.
 
 
 [1]
 Nor do plaintiffs claim that they were denied any right or privilege which the stations granted any other citizen similarly situated
 
 
 [2]
 In my view, the level at which a particular television programming decision is made, just as the question of whether it is made by failure to initially select or by cancellation, is relevant here only in the sense of possibly being evidentiary of whether the decision is made on the basis of sympathy for or hostility to the program message or for some similar "political" type reason. In the context of these governmental stations broadcasting to the general public, I do not think it is of constitutional significance that the "sympathy" or "politics" influencing the decision is that of the program director or the university public affairs director or the station board of directors, when all are acting as governmental personnel
 
 
 [3]
 And plaintiffs do not contend their particular (or some similar) program must be shown to fairly balance the presentation on this subject matter which the stations have improperly slanted by showing some other program or programs